**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| In re: | |
| | |
| CALUMET ABRASIVES CO., INC., | Case No. 19-21257-jra |
| | |
| Debtor. | Chapter 11 |

**FIRST MIDWEST BANK'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW REGARDING DEBTOR'S EMERGENCY MOTION
FOR USE OF FIRST MIDWEST BANK'S CASH COLLATERAL AND
FIRST MIDWEST BANK'S MOTION REQUESTING ADEQUATE PROTECTION,
AND ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR USE OF FIRST
MIDWEST BANK'S CASH COLLATERAL, GRANTING FIRST MIDWEST BANK'S
MOTION REQUESTING ADEQUATE PROTECTION, AND PROHIBITING
DEBTOR'S USE OF FIRST MIDWEST BANK'S CASH COLLATERAL**

First Midwest Bank ("**FMB**"), by and through its undersigned counsel, and pursuant to this Court's instructions, hereby submits its Proposed Findings of Fact and Conclusions of Law Regarding Debtor's Emergency Motion for Use of First Midwest Bank's Cash Collateral and First Midwest Bank's Motion Requesting Adequate Protection, and Order Denying Debtor's Emergency Motion for Use of First Midwest Bank's Cash Collateral, Granting First Midwest Bank's Motion Requesting Adequate Protection, and Prohibiting Debtor's Use of First Midwest Bank's Cash Collateral, and respectfully states as follows:

## I.    PROPOSED FINDINGS OF FACT[1]

**A.    Description of the Debtor's Business, FMB Loans, and Events Prior to the Debtor's Bankruptcy Filing.**

1.    Calumet Abrasives Co., Inc. (the "**Debtor**") was founded in 1945 to provide high-performance, custom engineered solutions, private label, and traditional off-the-shelf abrasive cutting wheels.  Since 1986, the Debtor has been largely a private label company focusing on the brand development of its customers, specializing in bonded abrasives used on wheels that can cut metal or other types of products.  (Debtor's Emergency Motion for Use of First Midwest Bank's Cash Collateral [Doc. 10] (the "**Cash Collateral Motion**") at ¶ 1; 10/3 Tr. at 20-21)

2.    Prior to the bankruptcy filing, the Debtor entered into two business loan agreements with Standard Bank and Trust Company that were subsequently assigned to FMB. (Cash Collateral Motion at ¶ 1)

3.    FMB made a loan (the "**LOC Loan**") to the Debtor pursuant to a Business Loan Agreement dated as of August 30, 2012 (as amended, restated or replaced from time to time, including most recently by that certain Business Loan Agreement dated as of March 22, 2018 between the Debtor and FMB, and that certain Change in Terms Agreement dated as of November 14, 2018, the "**LOC Loan Agreement**"). The LOC Loan is evidenced by a certain Promissory Note dated as of September 10, 2012 in the original principal amount of $500,000.00 made by the

---

[1] FMB's proposed findings of fact are based on the testimonial and documentary evidence presented at the Final Hearing conducted on October 3 and 10, 2019, and certain motions and orders available on the Court's docket in the Debtor's above-captioned case, matters of which the Court may take judicial notice. "Judicial notice is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties." *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997) ("The most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records.") (quoting 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure: Evidence § 5106, at 505 (1st ed. 1977 & Supp. 1997).  Citations to the Final Hearing transcript shall be made as "10/3 Tr. at ___" or "10/10 Tr. at ___", and citations to Final Hearing exhibits shall be made as "Debtor Ex. ___" or "FMB Ex. ___."  Citations to motions or orders on the Court's docket shall be made as "Doc. ___."

Debtor and payable to the order of FMB (as amended, restated or replaced from time to time, including as increased to $1,000,000.00 and last amended by that certain Change In Terms Agreement dated as of November 14, 2018, the "**LOC Note**").  (FMB Ex. 62 at ¶ D)

4.      The LOC Note is secured by (i) Commercial Security Agreement dated as of August 30, 2012 granting to FMB a security interest in the "**Collateral**" as more particularly set forth therein, executed and delivered by the Debtor in favor of FMB (as amended, restated or replaced from time to time, the "**LOC Security Agreement**"); (ii) that certain Commercial Guaranty dated as of June 5, 2016, given by John G. Anderson ("**Guarantor**") in favor of FMB (as amended, restated or replaced from time to time, including by that certain Commercial Guaranty dated as of August 4, 2017 given by Guarantor in favor of FMB, the "**LOC Guaranty**") guaranteeing the LOC Loan; and (iii) certain other loan documents evidencing, securing and/or guaranteeing the LOC Loan (collectively, the "**LOC Loan Documents**").  (FMB Ex. 62 at ¶ E)

5.      The Debtor and FMB are also parties to a loan (the "**Equipment Loan**") pursuant to the terms and conditions of a Business Loan Agreement dated as of June 29, 2016 (as amended, restated or replaced from time to time, the "**Equipment Loan Agreement**").  The Equipment Loan is evidenced by a certain Promissory Note dated as of June 29, 2016 in the original principal amount of $900,000.00 made by the Debtor and payable to the order of FMB (as amended, restated or replaced from time to time, including as amended by that certain Promissory Note dated as of January 1, 2018 in the original principal amount of $896,932.48 made by the Debtor and payable to the order of FMB, the "**Equipment Note**").  (FMB Ex. 62 at ¶ G)

6.      The Equipment Note is secured by (i) Commercial Security Agreement dated as of June 29, 2016 granting to FMB a security interest in the "**Collateral**" as more particularly set forth therein, executed and delivered by the Debtor in favor of FMB (as amended, restated or replaced

from time to time, the "**Equipment Security Agreement**"); (ii) that certain Commercial Guaranty dated as of June 29, 2016, given by Guarantor in favor of FMB (as amended, restated or replaced from time to time, the "**Equipment Guaranty**") guaranteeing the Equipment Loan; and (iii) certain other loan documents evidencing, securing and or guaranteeing the Equipment Loan (collectively, the "**Equipment Loan Documents**" and collectively with the LOC Loan Documents, the "**Loan Documents**").  (FMB Ex. 62 at ¶ G)

7.      The LOC Loan and the Equipment Loan are cross-defaulted and cross-collateralized.  (FMB Ex. 62 at ¶ H)

8.      As of the Debtor's May 7, 2019 bankruptcy petition date (the "**Petition Date**"), the outstanding principal balance of the LOC Loan was $1,000,000.00, plus accrued interest since December 20, 2018, plus such other late fees, costs, fees and expenses, including legal fees and expenses incurred by FMB.  (Id.)

9.      As of the Petition Date, the outstanding principal balance of the Equipment Loan was $691,396.32, plus accrued interest since April 8, 2019, plus such other late fees, costs, fees and expenses, including legal fees and expenses incurred by FMB.  (Id.)

10.     Exhibit A to the Cash Collateral Motion identifies FMB's "Collateral" as "all personal and fixture property of every kind and nature including without limitation all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-or-credit [sic] rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, and other contract rights or rights to the payment of money, insurance claims and proceeds, and all general intangibles); whether any of the foregoing is owned or acquired later; all accessions,

4

additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to and of the foregoing (including insurance, general intangibles and account proceeds)."  (Cash Collateral Motion at Ex. A)

11.    The Debtor has stipulated that FMB's Loan Documents are valid and enforceable, and that FMB has valid, perfected and unavoidable first priority liens and security interests on and against the Collateral and any cash collateral that the Debtor seeks authority to use in the Cash Collateral Motion.  (FMB Ex. 62 at ¶ J)

12.    In December 2018, Robert Shindorf ("**Shindorf**") acquired 50% of the outstanding shares of the Debtor's stock from then sole-shareholder John Anderson ("**Anderson**"), who retained 50% of the Debtor's stock, pursuant to a stock purchase agreement.  At the same time, Anderson resigned from his role as officer and director of the Debtor, and Shindorf was elected as sole director, president, secretary and treasurer of the Debtor. (Cash Collateral Motion at ¶ 2; FMB Ex. 3)

13.    Prior to that time, Shindorf had identified the Debtor as a potential supplier of private-label bonded abrasive products, and as an acquisition target to complement Shindorf's other companies operating in the abrasives industry.  (10/3 Tr. at 19-24; 10/10 Tr. at 117-118)

14.    Shindorf paid Anderson $50 for 50% of the outstanding shares of the Debtor's stock and provided no other consideration to Anderson.  (FMB Ex. 3, 10/3 Tr. at 118-119)

15.    Shindorf testified that the Debtor was a very difficult company to value, in part, because 3M was the biggest customer and with 3M there is no guaranteed revenue beyond a three-month order forecast. (10/3 Tr. at 119)

16.    Shortly after Shindorf assumed control of the Debtor in December 2018, he stopped making mortgage payments to FMB notwithstanding the previous arrangement whereby the

Debtor would make the mortgage payments to FMB on behalf of Anderson for the Hammond, IN properties where the Debtor operates its business.  (10/3 Tr. at 148)

17.     Within a few months after they entered into the December 2018 stock purchase agreement, Anderson and Shindorf had a falling-out regarding decision-making and their respective roles with the Debtor.  (10/3 Tr. at 126)

18.     On April 1, 2019, Shindorf initiated a lawsuit on behalf of the Debtor against Anderson in the Lake County, Indiana court seeking injunctive and other relief. (FMB Ex. 2; 10/3 Tr. at 126-127)

19.     Around the same time that he filed the lawsuit against Anderson, Shindorf executed a Memorandum of Action and a Line of Credit Note, both of which were backdated to December 17, 2018, to memorialize a deferred compensation arrangement under which Shindorf would earn an annual salary of $260,000 from the Debtor.  (FMB Ex. 4; 10/3 Tr. at 129-132)

20.     Shindorf testified that he and Anderson discussed his deferred compensation arrangement in December 2018, and that he would not draw a salary until the Debtor's business was stabilized and profitable.  (10/3 Tr. at 129-132)

21.     However, in late April 2019 during the two weeks leading up to the Debtor's bankruptcy filing on May 7, 2019, Shindorf stopped deferring compensation and started drawing a bi-weekly salary of $5,000.  (10/3 Tr. at 133)

22.     In March 2019, after the Debtor defaulted under the Loan Documents, FMB considered seeking the appointment of a receiver for the Debtor's business and engaged Sandor Jacobson ("**Jacobson**") of Plante Moran for that purpose. (10/10 Tr. at 10)

23.     Jacobson holds a Bachelor of Arts degree from the University of Texas in Austin where he minored in business administration.  Jacobson became a certified public account in 2010.

From 2003 to 2017, Jacobson was employed by Abrams and Jossel Consulting, which is a boutique crisis management and restructuring firm that works with middle market companies. In 2017, Jacobson joined Plante Moran as a restructuring principal in the Chicago office. Jacobson has more than 15 years of experience consulting with underperformed, distressed businesses including manufacturing companies like the Debtor. (10/10 Tr. at 7-9)

24.     In April 2017, Jacobson conducted an investigation of the Debtor's business and finances, including a review of financial information that he obtained from Shindorf, and he spent three full days at the Debtor's Hammond facility interview some of the Debtor's key employees and assessing the Debtor's operations. (10/10 Tr. at 10)

25.     Jacobson identified "a lot of troubling facts" about the Debtor including over $100,000 of unpaid payroll taxes, a terminated health insurance plan where employees had money withheld from their paychecks that was not used to fund insurance premiums, and a huge negative working capital position. (10/10 Tr. at 11-12)

26.     Jacobson's findings with regard to the Debtor's financial and operation condition were memorialized in a Viability Assessment Report dated May 3, 2019. (FMB Ex. 36)

27.     Shortly before the scheduled hearing in state court on FMB's complaint to appoint Jacobson as receiver for the Debtor's business, on May 7, 2019, the Debtor filed its voluntary chapter 11 petition in this Court. (10/10 Tr. at 17; Doc. 1)

**B.     Debtor's Cash Collateral Motion and the Agreed Interim Cash Collateral Orders**

28.     On May 7, 2019, the Debtor filed the Cash Collateral Motion.

29.     On May 13, 2019, FMB filed its Preliminary Objection to the Cash Collateral Motion. (Doc. 24)

103913005.v2

30.    On May 14, 2019, the Court entered the Interim Order Authorizing the Debtor's Use of First Midwest Bank's Cash Collateral, Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Scheduling Final Hearing on Use of Cash Collateral and continued the Cash Collateral Motion for final hearing on May 23, 2019.  (Doc. 29)

31.    On May 21, 2019, FMB filed a second Objection to the Cash Collateral Motion. (Doc. 46)

32.    On June 18, 2019, the Court entered the Second Stipulated Interim Order Authorizing the Debtor's Use of First Midwest Bank's Cash Collateral, Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Scheduling Final Hearing on Use of Cash Collateral dated June 18, 2019 (the "**Second Interim Order**"), which included a weekly cash budget for the Debtor's use of cash collateral through August 17, 2019.  (FMB Ex. 62)

33.    In the Second Interim Order, the Court authorized the Debtor's use of First Midwest Bank's cash collateral "in accordance with, and without exceeding, the amounts set forth in the budget" attached as Exhibit A to the Interim Order.  (Id. at ¶ 5)

34.    Jacobson worked with Shindorf to prepare the weekly cash budget attached to the Second Interim Order, getting away from the accrual-based model that Shindorf proposed so that FMB would be able to monitor the Debtor's cash use.  (10/10 Tr. at 18-19)

35.    At trial, Jacobson explained the difference between a cash budget and an accrual budget.  He explained that an accrual-based method accounts for revenue when it is earned, but it does not show when the revenue is actually collected.  He further explained that on the expense side an accrual budget shows when expenses are incurred, but it does not reflect when expenses are actually paid.  Jacobson also testified that a thirteen-week cash budget is conventional when

dealing with distressed businesses because it allows one to measure utilization of cash and accounts receivable over a reasonable time period. (10/10 Tr. at 18-19)

36.     Jacobson explained that the budget attached to the Second Interim Order reflects, on a weekly basis, the anticipated cash receipts that are going to be collected by the Debtor, as well as the weekly cash disbursements that are going to be made by the Debtor. In addition, the budget attached to the Second Interim Order reflects projected changes to the Debtor's cash position based on projected net cash flows, and projected changes to accounts receivable as they are generated and actually collected by the Debtor. Those features of the weekly cash budget attached to the Second Interim Order allow FMB to monitor the Debtor's use of cash collateral and generation of new accounts receivable to determine whether its collateral position is being preserved or eroded. (Id. at 24-25)

37.     The Second Interim Order granted several forms of relief as adequate protection to First Midwest Bank "for any use or diminution in the value of [First Midwest Bank's] interests in the Collateral, including the Cash Collateral" including payments by the Debtor to FMB of $15,000 by June 6, 2019, effective as of June 1, 2019, and $3,750 per week beginning June 8, 2019. (*Id*. at ¶ 7)

38.     Paragraph 7(v) of the Second Interim Order provides:

> The relief set forth in this Interim Order does not constitute a finding that "adequate protection" First Midwest Bank's interests exists pursuant to sections 361 and 363 of the Bankruptcy Code, and First Midwest Bank's right to seek additional protection, including "adequate protection" pursuant to sections 361 and 363 of the Bankruptcy Code, is hereby reserved. However, the Parties Stipulate $15,000 per month will be adequate for the term of this budget.

*Id*.

103913005.v2

39.     It is undisputed that the Debtor continues to possess and use equipment that is pledged as collateral to FMB.  The parties disagree, however, regarding the extent to which the equipment is depreciating.

40.     Jacobson testified that FMB accepted $3,750 weekly adequate protection payments as a reasonable measure of the decreasing value of the equipment collateral based on the Debtor's straight-line depreciation of its fixed assets (i.e., equipment) at a rate of $21,750 per month according to the Debtor's financial statements, and also taking into consideration that the vast majority of the Debtor's equipment is FMB's collateral.  The $15,000/month adequate protection payment is also less than the Debtor's monthly debt service payments of $16,746.53 for the Equipment Loan from FMB.  (10/10 Tr. at 27-34; FMB Exs. 48, 56)

41.     Shindorf testified that the Debtor has "overpaid" for adequate protection, and he asserted that no more adequate protection payments should be required through March 2020. Despite the fact that the Debtor agreed to pay FMB $3,750 per week in the Second Interim Order, Shindorf offered his opinion that $750 to $850 per week would have been a "fair and reasonable" amount of adequate protection.  (10/3 Tr. at 94-99)

42.     In response to the question of "So what went into your calculations for adequate protection?" Shidorf testified as follows:

> So I used more than one method because I like to vet calculations. I don't -- I try to be as objective as possible. First, I relied on my experience. I've actually looked at two other bond and abrasive companies to purchase them, and in receiving their information, both income statements, asset equipment list, balance sheets, I've gained information from there. Also I understand what we've purchased equipment for, what that equipment could be sold back to those manufacturers -- different manufacturers offered us different prices for the equipment back. I instructed staff to help work on valuing our equipment, in which they did research to call -- one of the pieces of equipment is Hydramet, just as an example -- to call Hydramet, see how much a piece of equipment might be worth on the open market, as well as outside information that was provided to us from First Midwest Bank itself. Overall, through those different calculations, my experience, our internal

10

investigation, as well as the information received from FMB, we came to around $460,000 is what I believe an orderly liquidation slash -- yeah, I guess let's call it orderly liquidation. Some of them might be fair market value because it takes time to sell certain assets. It's a small market, it's four to five companies that might be doing this.

(10/3 Tr. at 97-98)

43.    The Court sustained FMB's objections to the Debtor's attempt to introduce equipment appraisals on hearsay grounds (10/3 Tr. at 66-68), and the Debtor did not establish that Shindorf is qualified to offer an expert opinion regarding the valuation of the Debtor's equipment. In addition, Shindorf did not sufficiently explain how he arrived at a value of "around $460,000" for the various pieces of equipment that comprise FMB's collateral, why orderly liquidation is the appropriate valuation standard, or how he determined the $750 to $850 per week figure based on his $460,000 valuation.

44.    The Court finds that Shindorf's opinions are unsupported and unreliable.   In contrast, the $3,750 weekly adequate protection payment that the Debtor agreed to pay pursuant to the Second Interim Order, which amount is supported by the Debtor's own depreciation schedule, is a reasonable measure of the equipment depreciation and the amount of periodic adequate protection payments to which FMB is entitled.

C.    **The Loss of the Debtor's Largest Customer, the Erosion of FMB's Collateral, and the Debtor's Financial Reporting Errors, Multiple Proposed Budgets and Unreliable Projections.**

45.    In July 2019, during the term of the Second Interim Order, the Debtor ceased doing business with its largest customer, 3M Innovation Singapore, which represented approximately 72% of the Debtor's total revenue at the time.  (10/10 Tr. at 38-42; FMB Exs. 25, 44)

11

46. As a consequence, the Debtor terminated many of its employees. At the time of the bankruptcy filing, the Debtor had approximately 60 employees. That number has been reduced to 15 or 16 full-time employees currently. (10/3 Tr. at 135)

47. On August 27, 2019, the Debtor and FMB entered into the Third Stipulated Interim Order Authorizing the Debtor's Use of First Midwest Bank's Cash Collateral, Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Continuing Final Hearing on Use of Cash Collateral (the "**Third Interim Order**"). (Doc. 151)

48. The parties filed an Amended Third Stipulated Interim Order Authorizing the Debtor's Use of First Midwest Bank's Cash Collateral, Granting Adequate Protection Therefor Pursuant to Sections 361 and 363 of the Bankruptcy Code and Continuing Final Hearing on Use of Cash Collateral (the "**Amended Third Interim Order**") on September 10, 2019, to correct the October 5, 2019 Expiration Date, and the Court entered the Amended Third Interim Order on September 11, 2019. (Docs. 167, 172; FMB Ex. 63)

49. The Amended Third Interim Order incorporated the stipulations, terms and conditions of the Second Interim Order, except as expressly modified or supplemented by the terms of the Amended Third Interim Order. (FMB Ex. 63 at ¶ 1)

50. The Debtor agreed that it did not have authority to spend funds in excess of the amounts set forth in the budget attached to the Amended Third Interim Order based on any positive variance that accrued during any prior budget period. (Id. at ¶ 4)

51. In addition, the Debtor agreed that it would not make any disbursements that would cause the Debtor's aggregate cash balances to be less than $425,000. (Id. at ¶ 5)

52.     FMB negotiated for these provisions to prevent the erosion of FMB's cash collateral position based on concerns regarding the Debtor's declining accounts receivable and the Debtor's significant accrued post-petition payables. (10/10 Tr. at 44)

53.     The Debtor agreed to pay $11,000 for its use and occupancy of the properties located at 3023 and 3039 – 169th Place, Hammond, IN, for the month of August, and further agreed to pay all of the outstanding real estate taxes for those properties by August 29, 2019.   (FMB Ex. 63 at ¶¶ 12, 13)

54.     Jacobson explained that the Debtor was required to pay the real estate taxes under the Amended Third Interim Order because the Debtor had historically been responsible for payment the real estate taxes in connection with its use of the properties.  (10/10 Tr. at 44)

55.     The Amended Third Interim Order further required the Debtor "to repay the loans on the following life insurance policies (Northwestern Mutual Policies Nos. 16433511 & 16769260) to replenish the cash surrender value that was used to fund premium payments without the Lender's consent by August 29, 2019, and the Debtor agrees to make future insurance premium payments from Cash Collateral . . ." (FMB Ex. 63 at ¶ 15; 10/10 Tr. at 44-45)

56.     The combined amount of the monthly premium payments for the two insurance policies referenced in the Amended Third Interim Order is $1,081.89.  (10/10 Tr. at 45-47; FMB Ex. 59)

57.     The budget attached to the Amended Third Interim Order included continued weekly adequate protection payments by the Debtor to FMB in the amount of $3,750 through the week ending October 5, 2019.  (FMB Ex. 63, Ex. A)

58.     Paragraph 10 of the Amended Third Interim Order provides that "[t]he Debtor agrees to provide [FMB] with its proposed budget for use of cash collateral beyond the Expiration

Date by no later than August 29, 2019." *Id*. FMB requested the Debtor's proposed budget so that it could determine whether its interests would be adequately protected in connection with the Debtor's proposed continued use of cash collateral beyond the October 5, 2019 expiration date. (10/10 Tr. at 48)

59.     The Debtor did not provide its proposed cash collateral budget to FMB by the August 29, 2019 deadline set forth in the Amended Third Interim Order. (10/10 Tr. at 48, 68)

60.     On or about September 16, 2019, in response to discovery issued by FMB, the Debtor produced a weekly cash for the period of the week ending October 5, 2019 through the week ending December 28, 2019 (the "**Original Proposed Budget**"), which was prepared by Shindorf and presented to FMB as the Debtor's proposed budget for continued use of cash collateral for purposes of the Final Hearing scheduled to begin on October 3, 2019. (FMB Ex. 32; 10/3 Tr. at 150-152; 10/10 Tr. at 48, 69-70)

61.     The Original Proposed Budget was a cash budget similar in form to the cash budgets that were negotiated by the Debtor and FMB and attached to the Second Interim Order and the Amended Third Interim Order. The Original Proposed Budget projected actual cash receipts and disbursements, and it reflected how those receipts and disbursements would impact the Debtor's cash position, as well as any projected changes in the Debtor's accounts receivable over a thirteen-week period. (FMB Ex. 32)

62.     Specifically, with regard to the Debtor's projected cash position, the Original Proposed Budget projected three weeks of negative cash flows and nine weeks of positive cash flows with an overall increase in the Debtor's cash balance of $19,350 over the entire budget period. (FMB Ex. 32; 10/10 Tr. at 75-76)

63.     Jacobson identified multiple concerns regarding the Original Proposed Budget including (i) the inadequacy of the $350 weekly amount budgeted for equipment repairs, which were budgeted at $2,000 per week in the Second Interim Order; (ii) the absence of any amount budgeted for United States Trustee fees owed and expected to be owed by the Debtor; (iii) the absence of any amount budgeted for the Wintrust equipment and the compressor, which were previously budgeted at $8,600 and $1,200 per month, respectively; (iv) the absence of any amount budgeted for life insurance premium payments; (v) the inclusion of only one month of utility payments in the amount of $5,500 for a 3 month budget period; and (vi) the provision for only one adequate protection payment to FMB in the amount of $750 during the first week of the budget. Jacobson further testified that the Debtor has already spent approximately $50,000 on equipment repairs and maintenance during the first five months of the bankruptcy case. (10/10 Tr. at 70-72)

64.     Shindorf admitted that inclusion of only one month of utility payments in the amount of $5,500 for a 3 month period and the $350 adequate protection payment included in the first week of the Original Proposed Budget were mistakes. (10/3 Tr. at 154-155)

65.     In addition, Jacobson noted that the Original Proposed Budget did not forecast payment of the Debtor's outstanding accounts payable, real estate taxes or personal property taxes. (10/10 Tr. at 70-72)

66.     According to the Debtor's accounts payable aging report, the Debtor's accounts payable totaled $90,706.19 as of September 28, 2019 (FMB Ex. 68).

67.     However, the Debtor's accounts payable aging report does not include unbilled attorneys' fees incurred by the Debtor in connection with the cash collateral and stay relief disputes before the Court. Nor have those unbilled attorneys' fees been reported in the Debtor's monthly operating reports. (*See*, *e.g.*, FMB Ex. 66; 10/3 Tr. at 143-145)

15

68. The Debtor's accounts payable aging report also does not include any post-petition personal property taxes even though the Debtor's personal property tax bill for the prior year (2018 tax, payable in 2019) was $72,189.58 and personal property taxes continue to accrue post-petition. (FMB Ex. 57; 10/3 Tr. at 145; 10/10 Tr. at 73-75)

69. The Debtor's accounts payable aging report also does not include any quarterly fees payable to the United States trustee under 28 U.S.C. § 1930(a)(6) bankruptcy fees. Jacobson analyzed the Debtor's quarterly fees for the second and third quarters of 2019 based on the Debtor's filed monthly operating reports for May through August and based on the Debtor's financial statement for the month of September. Jacobson's analysis reflects that the Debtor still owes $445 for the second quarter of 2019, and the Debtor will owe $13,072 for the third quarter of 2019, which is payable on or before October 31, 2019. (FMB Ex. 60; Debtor Exs. 1-4; 10/10 Tr. at 65-68)

70. To assess FMB's cash collateral position, Jacobson prepared a summary document entitled "AR, CASH, POST PETITION AP VARIANCE TO 9-28" based on information in the Debtor's Schedules and financial reporting provided by the Debtor to FMB pursuant to the Amended Third Interim Order. Jacobson's variance analysis compares FMB's cash collateral position, in terms of the Debtor's cash, accounts receivable and post-petition accounts payable, as of the Petition Date and as of September 28, 2019, and reflects the following:

|  | **ACTUAL** Petition Date **5/7/2019** | **ACTUAL** Week Ended **\*9/28/2019** | *Variance* |
|---|---|---|---|
| ENDING CASH BALANCE | 267,068 | 574,835 | 307,767 |
| A/R ENDING BALANCE | 368,402 | 98,673 | (269,729) |
| *TOTAL* | 635,470 | 673,508 | 38,038 |
| ACCOUNTS PAYABLE POST PETITION $  - |  | 90,706 | (90,706) |
|  |  | 90,706 | (52,668) |

(FMB Ex. 69; see also FMB Ex. 12, 67, 68)

71.    Jacobson's analysis illustrates that while the Debtor's cash position increased by $307,767 from the Petition Date to September 28, 2019, the Debtor's accounts receivable decreased by $269,729 and the Debtor's post-petition accounts payable increased by $90,706 during the same period.  If the Debtor were to pay all of its reported post-petition accounts payable, FMB's collateral position would be eroded by $52,668.  FMB's collateral position would be further eroded if the Debtor were to pay the additional, unreported attorneys' fees, personal property taxes and United States trustee quarterly fees that the Debtor has incurred and/or is accruing, but did not report on its accounts payable aging report.

72.    When the Debtor produced the Original Proposed Budget to FMB on or about September 16, 2019, it also produced a document entitled "Pro Forma Monthly Profit & Loss Statement for the Fiscal Year 2019" (the "**Original Pro Forma**") The Original P&L Statement projected the following revenue amounts: October ($155,884), November ($133,883), December ($148,067), January ($151,721), February ($154,787), and March ($124,648).  (Debtor Ex. 22; 10/3 Tr. at 157)

73.    Following Shindorf's deposition, the Debtor abandoned the Original Proposed Budget, and two days before the Final Hearing that began on October 3, 2019, the Debtor produced

a new document entitled "Pro Forma Monthly Profit & Loss Statement – October 2019 to March 2020" (the "**Amended Pro Forma**") to FMB as the Debtor's new proposed budget for the Final Hearing.  (Debtor Ex. 23; 10/3 Tr. at 156; 10/10 Tr. at 77)

74.     In contrast to the Debtor's Original Proposed Budget through December 28, 2019, the Amended Pro Forma extends to March 2020.  (*Compare* FMB Ex. 32 *with* Debtor Ex. 23)

75.     In contrast to the Debtor's Original Proposed Budget and the budgets attached to the Second Interim Order and the Amended Third Interim Order, which are weekly cash budget projections, the Amended Pro Forma is a monthly accrual-based projection.  (*Id*.; 10/3 Tr. at 152-153)

76.     Accordingly, the Amended Pro Forma projects when revenue will be earned by the Debtor, but it does not project when revenue will be collected by the Debtor.  Similarly, the Amended Pro Forma projects when additional expenses will be incurred by the Debtor, but it does not project when expenses will be paid by the Debtor.  Moreover, the Amended Pro Forma does not address when previously accrued accounts receivable will be collected or how previously incurred accounts payable will be paid by the Debtor.  (10/3 Tr. at 160-161; 10/10 Tr. at 79-80)

77.     In sum, the Amended Pro Forma does not project changes in the Debtor's cash position or accounts receivable, and thus does not allow FMB (or the Court) to appropriately monitor and limit or condition the Debtor's cash use in a manner that ensures no diminution or decrease in FMB's cash collateral position.

78.     In addition, the Amended Pro Forma includes substantially higher revenue projections than the Original Pro Forma produced by the Debtor approximately two weeks earlier based on separate categories of "committed," "forecast," and "projected" orders, which vary by month.  Specifically, the Amended Pro Forma projects the following revenue amounts: October

18

($282,895 versus $155,884 in the Original Pro Forma), November ($189,956 versus $133,883 in the Original Pro Forma), December ($176,407 versus $148,067 in the Original Pro Forma), January ($175,000 versus $151,721 in the Original Pro Forma), February ($175,000 versus $154,787 in the Original Pro Forma), and March ($175,000 versus $124,648 in the Original Pro Forma).  (Compare Debtor Ex. 22 and 23)

79.    The Amended Pro Forma projects total revenue of $1,174,258 over the sixth month period, including $515,071 of committed orders, $34,188 of forecasted orders, and $650,000 of projected orders.  (Debtor Ex. 23)  The Debtor provided no documentary evidence in support of its revenue projections, and the Debtor offered limited testimony from Shindorf and Ray Sparks, the Debtor's director of manufacturing operations, regarding the committed and forecasted orders. Moreover, Shindorf admitted that there is no guarantee that 3M will place any more orders with the Debtor beyond the current committed orders.  (10/3 Tr. at 161)  Indeed, all of the $650,000 projected orders referenced in the Amended Pro Forma appear to be speculative.

80.    The Amended Pro Forma also fails to account for potential business interruption and costs in excess of $150,000 that the Debtor might have to incur if it needs to relocate its business from the current location based on the pending stay relief proceedings and any resulting eviction.  (10/3 Tr. at 163, 188-190)

81.    The Amended Pro Forma has additional shortcomings, including failure to provide for United States trustee statutory fees due in January 2020, failure to provide for continued adequate protection payments to FMB at $3,750 per week, failure to sufficiently budget for equipment repairs and maintenance, and failure to provide for life insurance premium payments. (Debtor Ex. 23)

82.     Shindorf admitted that he changed from a weekly cash budget to a monthly accrual budget to create flexibility in the event that the Debtor incurs losses on a weekly basis.  (10/3 Tr. at 165)  Shindorf further admitted that "a cash budgeting method, by definition, would be better for cash use."  (10/3 Tr. at 183) Based on the obvious shortcomings of the Original Proposed Budget and the Debtor's sudden shift from a cash budget to an accrual budget, the Debtor's reliance on the Amended Pro Forma evidences an attempt by the Debtor to obscure the shortcomings in the Debtor's cash flow projections.

83.     Shindorf admitted that there is significant risk associated with the Debtor's continued business operations, such that Shindorf will not allow his other company Lehigh Abrasives to do business with the Debtor.  However, the Debtor's proposed use of cash collateral under a speculative, accrual-based budget that cannot be monitored by FMB and policed by the Court, similarly exposes FMB to the risk associated with the Debtor's business and the risk that FMB's cash and non-cash collateral will continue to decrease in value.  (10/3 Tr. at  166-167)

## II.     PROPOSED CONCLUSIONS OF LAW[2]

### A.     Jurisdiction

84.     The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code, or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a).  In accordance with section 157(a), the

---

[2] To the extent that these Conclusions of Law including findings of fact, they are adopted as such.

District Court for the Northern District of Indiana has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Indiana pursuant to Local Rule 200.1(a)(1).

85.    A bankruptcy judge to whom a case has been referred may enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3).  As to the former, the bankruptcy court may hear and determine such matters.  28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c).  Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

86.    In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter.  *Stern v. Marshall*, 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g., Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

87.    Contested matters regarding a debtor's motion for authority to use cash collateral and requests for adequate protection are core proceedings that arise under the Bankruptcy Code

103913005.v2

and for which bankruptcy courts have authority to enter final orders. *See*, *e.g.*, *In re McCombs*, No. 11-01293-MAM-11, 2011 WL 4458893, at *1 (Bankr. S.D. Ala. Sept. 23, 2011). Furthermore, the Debtor and FMB have expressly or impliedly consented to this Court's entry of a final order.   Accordingly, this Court has statutory and constitutional authority to enter a final order adjudicating the Debtor's Cash Collateral Motion and FMB's Motion Requesting Adequate Protection.

**B.      Bankruptcy Code Provisions Governing Use of Cash Collateral, Adequate Protection and Burden of Proof**

88.      As debtor in possession, the Debtor has all of the rights and duties of a trustee, other than the right to compensation under section 330 of the Bankruptcy Code and except for the duties specified in sections 1106(a)(2), (3) and (4) of the Bankruptcy Code.  11 U.S.C. § 1107(a).

89.      Section 363(c)(2) of the Bankruptcy Code provides:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

90.      According to section 363(a) of the Bankruptcy Code, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.  11 U.S.C. § 363(a).

103913005.v2

91.    Pursuant to the Second Interim Order, the Debtor has stipulated to the validity and priority of FMB's security interests, including its interests in cash collateral.  As evidenced by its objections and position taken at the Final Hearing, FMB does not consent to the Debtor's continued use of FMB's cash collateral.  Therefore, under section 363(c)(2), the Debtor may not use cash collateral unless this Court authorizes such use in accordance with the provisions of section 363 of the Bankruptcy Code.

92.    Pursuant to section 363(e), the Debtor cannot use FMB's cash collateral unless the Debtor demonstrates that FMB's interests in cash collateral are adequately protected.  *See In re EES Lambert Assocs.*, 62 B.R. 328, 343 (Bankr. N.D. Ill. 1986).

93.    Section 363(e) states:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

11 U.S.C. § 363(e).

94.    The concept of adequate protection derives from the Fifth Amendment protection of property interests.  In this respect, the United States Supreme Court has held that bankruptcy power is subject to the Fifth Amendment due process clause prohibiting the taking of private property without compensation despite a public purpose for the taking.  *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555 (1935); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 511-512 (Bankr. N.D. Ala. 2002).

95.     In *EES Lambert Assocs.*, the court explained that "cash collateral is a unique form of collateral that requires special protection since it is most likely to be consumed during the reorganization process and is at times subject to change on an almost daily basis.  Its use must be prohibited or conditioned as is necessary to provide adequate protection of the secured creditor's interest."  *Id.* at 343; *see also Fed. Nat. Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship*, 153 B.R. 204, 210 (N.D. Ill. 1993) ("section 363(e) . . . requires that the Debtor cannot use cash collateral unless it provides adequate protection for the secured creditor's interest.").

96.     Although "adequate protection" is not defined in the Bankruptcy Code, section 361 provides illustrative examples of adequate protection; specifically, that a debtor may provide periodic cash payments, additional or replacement liens, or other relief that will result in the indubitable equivalent of the secured creditor's interest in property. *See* 11 U.S.C. § 361; *In re Briggs Transp. Co.*, 780 F.2d 1339, 1344 (8th Cir. 1985) ("…as demonstrated by the non-exclusive examples of section 361, adequate protection is the protection of a secured creditor's 'interest in property' from any decrease in 'value' attributable to the stay.").

97.     The basic purpose of adequate protection is to replace the protections afforded a secured creditor by a debtor's possession of its collateral.  *U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 207 (1983).  Adequate protection payments are designed to compensate a holder of a secured claim for any decline in the value of its collateral post-petition and pre-confirmation.  *U.S. Savings Association v. Timbers of Inwood Forest Assoc. Ltd*, 484 U.S. 65 (1988); *In re Delta Resources, Inc.*, 54 F.3d 722, 730 (11th Cir. 1995); *In re Cason*, 190 B.R. 917, 928 (Bankr. N.D. Ala. 1995).

98.     Ultimately, the test is whether the FMB's interest is protected from diminution or decrease as a result of the Debtor's proposed use of cash collateral.  *In re Gasel Tranp. Lines,*

24

103913005.v2

*Inc.,* 326 B.R. 683 (6th Cir. BAP 2005); *In re Carbone Companies, Inc.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008).

99.     Without a finding that FMB's interest in cash collateral is adequately protected, the Court may not authorize the Debtor's use of cash collateral without running afoul of the secured creditor's Fifth Amendment property right to a just compensation for a taking. *Carbone*, 395 B.R. at 635 (citing *Wright v. Union Cent. Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940)).

100.     Under section 363(p)(1), the Debtor has the burden of proof on the issue of adequate protection.   11 U.S.C. § 363(p)(1); *Carbone*, 395 B.R. at 635 (stating that "[a] debtor requesting court   approval   to   use cash collateral has   the burden of proof as   to   the   issue   of 'adequate protection'" and applying a preponderance standard).

101.     Some courts, including at least one court in this Circuit, have adopted a clear and convincing evidentiary standard that a debtor must satisfy to prove adequate protection of a secured creditor's interest in cash collateral.   *See In re O.P. Held, Inc.*, 74 B.R. 777, 784 (Bankr. N.D.N.Y. 1987); *In re Sheehan*, 38 B.R. 859, 868 (Bankr. D. S.D. 1984).   In *Sheehan*, based on the legislative history of section 361, the court described the "high burden of proof" as follows: "[a] party proposing to use cash collateral must prove by clear and convincing evidence that an entity claiming an interest in cash collateral will realize the value of its bargain in the light of all the facts and circumstances of the case." *Id*. at 868.

102.     In contrast to cash collateral, with respect to which a debtor has an affirmative obligation to demonstrate adequate protection of the secured creditor's interest, regarding non-cash collateral, such as the accounts receivable, equipment and insurance policies at issue in this case, FMB as the secured creditor has the initial burden of showing a likelihood that the collateral

will decrease in value on account of the debtor's use.  The burden then shifts to the Debtor to show that adequate protection is not needed or can be provided in a different manner.  *See Zink v. Vanmiddlesworth*, 300 B.R. 394, 403 (N.D.N.Y. 2003).

### C.    The Debtor Failed to Carry its Burden Regarding Adequate Protection of FMB's Cash and Non-Cash Collateral

103.    The Debtor has failed to demonstrate based on a preponderance of the evidence, let alone based on clear and convincing evidence, that FMB's interests in cash collateral will be adequately protected in connection with the Debtor's proposed use of cash through March 2020 or any additional period, for that matter.

104.    *In re Carbone Companies, Inc.* is instructive.  395 B.R. 631 (Bankr. N.D. Ohio 2008).  In *Carbone*, the debtors presented testimony from their president and a turnaround consultant.  *Id*. at 636.  The turnaround consultant testified that net cash flow projections for the ensuing quarter reflected positive increases as opposed to negative cash flows.  *Id*.  The projections reflected that net operating cash flows began at $108,803 prepetition and would increase to $196,630 by the end of the year.  *Id*. Similarly, the projections showed that eligible accounts receivable began at $453,432 prepetition and would increase to $515,255 by the end of the year. *Id*.  In support of the debtors' positive cash flow projections, the debtors exhibited a report comparing the projected budget to their actual budget for the previous month showing positive variances for cash, accounts receivable and expenses.  *Id*.  The consultant further opined that the debtors would be profitable going forward, and his testimony was not controverted by any persuasive evidence to the contrary. *Id*.  In addition, the debtors' president testified that the debtors' main clients would continue to do business with the debtors notwithstanding the pending bankruptcy proceedings.  *Id*. at 637.  Based on this evidence, the court in *Carbone* concluded that the bank had not suffered any diminution of its security interest and that the bank was adequately

protected because its cash collateral would not diminish based on the debtors' proposed use. *Id.* at 636.

105. This case stands in stark contrast to *Carbone*. The Debtor recently lost its largest customer, 3M Innovation Singapore, which represented approximately 72% of the Debtor's business. While the Debtor has a positive variance on cash since the Petition Date, the Debtor's accounts receivable is down by approximately $270,000 and the small positive variance of cash plus accounts receivable is completely offset by the Debtor's accrued post-petition accounts payable, the payment of which would result in a net negative variance of approximately $52,668 as of September 28, 2019. (FMB Ex. 69) Moreover, that figure does not include additional, unpaid postpetition liabilities of the Debtor that were not listed in the Debtor's accounts payable aging report.

106. Here, the Debtor did not present any cash flow projections whatsoever, let alone positive cash flow projections. Instead, the Debtor relied on the accrual-based Amended Pro Forma. The Debtor's reliance on the Amended Pro Forma is misplaced because it does not reflect how the Debtor's cash and accounts receivable will change based on the Debtor's continued use. The Amended Pro Forma suffers from numerous flaws, not least of which are speculative revenue projections and failure to account for payment of the more than $90,000 of accrued post-petition accounts payable. The Amended Pro Forma does not enable the Court to determine that FMB's interests in cash collateral are adequately protected.

107. Even if the Court was persuaded that the revenue projections in the Amended Pro Forma were reasonably supported and achievable, which the Court is not, it is not the Court's responsibility to extrapolate from the Amended Pro Forma how the Debtor's cash position will

change or to re-work the Debtor's proposed budget.  The court in *In re O.P. Held, Inc.*, 74 B.R.

777, 784 (Bankr. N.D.N.Y. 1987), addressed this point, stating as follows:

> As Debtor advanced what the Court must conclude is an unacceptable proposal, it is not the function of the Court to attempt to re-work Debtor's Proposal to an acceptable form; in this case, the Court would not even have data sufficient to embark on such an effort. *See Levin v. Kedzie-Carrol Currency Exchange, Inc. (In re Cash Currency Exchange, Inc.),* 52 B.R. 577, 581 (Bankr. N.D. Ill. 1985); *American Security Bank, N.A. v. Robson (In re Robson),* 10 B.R. 362, 365 (Bankr. N.D. Ala. 1981).  While the Court is a court of equity which seeks to rehabilitate and reorganize the financially ailing debtor, it cannot ignore the rights of secured creditors. *See M Bank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1398 (10th Cir.1987); *Crocker National Bank v. American Mariner Industries, Inc. (In re American Mariner Industries, Inc.),* 734 F.2d 426 (9th Cir.1984); *In re Certified Corp.,* 51 B.R. 768 (Bankr. D. Hawaii 1985). Adequate protection can only be determined if the Debtor is willing to cooperate with its secured creditor, providing sufficient, accurate information upon which both the creditor and the Court can make an informed decision.

108.    Through its use of the Amended Pro Forma, the Debtor has failed to provide

sufficient, accurate information upon which both FMB and the Court can make an informed

decision that FMB's interests in cash collateral are adequately protected.  Accordingly, the Court

concludes that the Debtor has failed to carry its burden of proof regarding adequate protection

under section 363 of the Bankruptcy Code and the Debtor's Cash Collateral Motion must be

denied.

109.    For similar reasons, the Debtor did not establish at the Final Hearing that FMB's

interests in accounts receivable are adequately protected.   FMB established through Jacobson that

the Debtor's accounts receivable have already declined by approximately $270,000 from the

Petition Date through September 28, 2019.  The Debtor's projected revenues were not adequately

supported at trial, and the inherently speculative nature of the projected orders in the Amended Pro

Forma prevent the Court from concluding that the Debtor can preserve and adequately protect

FMB's interest in accounts receivable.  Furthermore, the potential business interruption and

substantial estimated costs associated with the Debtor's potential eviction from the 3039 – 169th Place, Hammond, IN property and relocation to another facility, further support the Court's conclusion that FMB's interests in accounts receivable are not adequately protected.

110.    Finally, with regard to FMB's equipment collateral, FMB satisfied its initial burden of proof that the equipment collateral will decrease in value on account of the debtor's continued use.  The Debtor concedes that the equipment is depreciating, but disputes the amount of the deprecation and contends that it should receive a credit for the alleged overpayment of adequate protection under the Second Interim Order and the Amended Third Interim Order.

111.    The Court concludes that Shindorf was not qualified to provide valuation testimony and that his opinions regarding the actual deprecation of the equipment were unclear and unreliable.  It is well established that equipment appraisals and related opinions of value require "specialized knowledge" under Fed. R. Evid. 702.  *See, e.g., In re Walter B. Scott & Sons, Inc.*, 436 B.R. 582, 588 (Bankr. D. Idaho 2010).  Such opinions must be properly disclosed and provided in an expert report, and the qualifications of an expert witness must be established, all of which the Debtor failed to do in this case.

112.    Furthermore, the Debtor specifically agreed in the Second Interim Order that "$15,000 per month will be adequate for the term of this budget" (*id. at* ¶ 7(v)), and not for an extension of the budget through the end of 2019.  The Debtor's attempt to claim a credit for previous adequate protection payments that it made to FMB is tantamount to a repudiation of the prior stipulation and agreed order, which is not permissible.  *See Matter of Lafayette Dial, Inc.*, 92 B.R. 798 (Bankr. N.D. Ind. 1988).

113.    In *Lafayette Dial*, the court refused to relieve a debtor of obligations that it assumed pursuant to an agreed order of adequate protection "and which were imposed upon it when the

29

court approved that agreement." *Id.* at 800. The court explained that "a stipulation freely entered into by the parties is binding on the parties." *Id.* (citing *Matter of B.O.S.S. Partners I*, 37 B.R. 348, 350 (Bankr. M.D. Fla. 1984)). "Thus, an agreed order 'acquires the incidents of and is given the same force and effect as any other judgment.' It is a contract between the parties which has a judicial approbation—one to which the Court, as ultimate arbiter, has been made a signatory. It is not to be ignored, and can be set aside only upon the same bases as any other judgment. *Id.* (citing *In re Family Investments, Inc.*, 8 B.R. 572, 577 (Bankr. W.D. Ky. 1981)). Consequently, having once settled the dispute through the entry of an agreed order, a debtor is not permitted to change its mind and repudiate that agreement. Indeed, attempts to do so are frequently condemned in the strongest possible terms. *Id.* (citing *In re Herrera*, 23 B.R. 796, 797 (9th Cir. B.A.P. 1982). It is "bound by that settlement and order." *Id.* (citing *Matter of Springpark Association*, 623 F.2d 1377, 1380 (9th Cir. 1980)).

114.    Because the Debtor continues to use FMB's equipment collateral in the operation of its business and the equipment continues to depreciate, the Debtor agreed in the Second Interim Order (and continuing with the Third Interim Order), to make adequate protection payments of $3,750 per week. This amount is consistent with the Debtor's straight-line depreciation of its fixed assets including equipment prior to the bankruptcy filing at a rate of $21,750 per month. The $15,000 monthly adequate protection payment also compares favorably to the Debtor's $16,746.53 monthly payment amount for the FMB Equipment Loan.

115.    The Court concludes that FMB's interests in its equipment collateral are not adequately protected because the Debtor does not propose to continue paying the $3,750 weekly adequate protection payments that are supported by the record. FMB also raised legitimate concerns about the inadequate amount budgeted by the Debtor for equipment repairs and

maintenance in light of the substantial costs incurred by the Debtor for equipment repairs and maintenance since the Petition Date.

116.    Similarly, the Debtor's proposed Amended Pro Forma does not appear to include any of the life insurance premium payments that are necessary to preserve FMB's collateral interests in those policies.  Thus, FMB's interest in the life insurance policies are also not adequately protected.

117.    Based on the foregoing, the Court concludes that FMB's interests in cash and non-cash collateral will not be adequately protected in connection with the Debtor's proposed continued use of cash collateral.  Accordingly, the Court cannot condition cash use in a manner that provides adequate protection to FMB, and under section 363(e) of the Bankruptcy Code, the Court must prohibit the Debtor's continued use of FMB's cash.

**III.    ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR USE OF FIRST MIDWEST BANK'S CASH COLLATERAL AND FURTHER PROHIBITING DEBTOR'S USE OF FIRST MIDWEST BANK'S CASH COLLATERAL**

This matter having come before the Court for Final Hearing on Debtor's Emergency Motion for Use of First Midwest Bank's Cash Collateral [Doc. 10] and First Midwest Bank's Motion Requesting Adequate Protection [Doc. 198].

Based on the foregoing Findings of Fact and Conclusions of Law, the Court hereby Orders that:

(a)    Debtor's Emergency Motion for Use of First Midwest Bank's Cash Collateral is Denied;

(b)     First Midwest Bank's Motion Requesting Adequate Protection is Granted; and

(c)    The Debtor is prohibited from using First Midwest Bank's cash collateral.

31

Dated at Hammond, Indiana
on November ___, 2019.

_____
James R. Ahler, Judge
United States Bankruptcy Court

Dated:  October 31, 2019                Respectfully submitted,
                                         FIRST MIDWEST BANK

                                         By:   */s/ Gordon E. Gouveia II*
                                                *One of its attorneys*

Gordon E. Gouveia II
Fox Rothschild LLP
321 N. Clark Street, Suite 1600
Chicago, IL 60654
Tel: (312) 980-3816
Email: ggouveia@foxrothschild.com

-and-

Gordon E. Gouveia
GOUVEIA & ASSOCIATES, LLC
Attorneys At Law
433 W. 84th Drive Merrillville, IN 46410
Tel: (219) 736-6020
Email: gm6020@aol.com

103913005.v2

## CERTIFICATE OF SERVICE

I, Gordon E. Gouveia, an attorney, hereby certify that, on the 31st day of October, 2019, I filed and served a true and correct copy of the foregoing **FIRST MIDWEST BANK'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEBTOR'S EMERGENCY MOTION FOR USE OF FIRST MIDWEST BANK'S CASH COLLATERAL AND FIRST MIDWEST BANK'S MOTION REQUESTING ADEQUATE PROTECTION, AND ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR USE OF FIRST MIDWEST BANK'S CASH COLLATERAL, GRANTING FIRST MIDWEST BANK'S MOTION REQUESTING ADEQUATE PROTECTION, AND PROHIBITING DEBTOR'S USE OF FIRST MIDWEST BANK'S CASH COLLATERAL** upon the following parties in the manner so indicated.

*Gordon E. Gouveia II*

The following parties receive notice via the Court's CM/ECF Noticing System:

# Mailing Information for Case 19-21257-jra
**Electronic Mail Notice List**

The following is the list of **parties** who are currently on the list to receive email notice/service for this case.

- Greg A. Bouwer    gbouwer@kblegal.net, khand@kblegal.net
- Frederick L. Carpenter    flcarpenter@gmail.com
- Daniel L. Freeland    dlf9601@aol.com
- Nancy J. Gargula    USTPRegion10.SO.ECF@usdoj.gov
- Gordon E. Gouveia    geglaw@gouveia.comcastbiz.net
- Gordon E. Gouveia    gmlaw@gouveia.comcastbiz.net, ggouveia@ecf.axosfs.com
- Gordon E. Gouveia II    ggouveia@foxrothschild.com, orafalovsky@foxrothschild.com
- Thomas Higgins    tom@tomhigginslaw.com
- Jennifer Prokop    jennifer.prokop@usdoj.gov, jwprokop@yahoo.com
- Scott Albert Pyle    spyle@rubinoruman.com
- Sheila A. Ramacci (EW)    sar4198@aol.com

VIA EMAIL

Daniel L. Freeland
Sheila A. Ramacci
Daniel L. Freeland & Associates, P.C.
dlf9601@aol.com
sar4198@aol.com
*Counsel for the Debtor*

103913005.v2